IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

TAYLOR CHRISTIAN PROFITA,

Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY
OF COLORADO; the UNIVERSITY OF COLORADO
HEALTH SCIENCES CENTER, a/k/a University
of Colorado Denver/Anschutz Medical Campus; and
JOHN J. REILLY, JR., M.D., in his official capacity as
Dean of the University of Colorado Health Sciences Center,

Defendants.

---

**COMPLAINT**

---

COMES NOW Plaintiff by and through his attorney, John B. Roesler, and for his cause of action against Defendants states and alleges, as follows:

## INTRODUCTION

1. This case arises under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq., in particular violation of § 1232 of Subchapter II, Part A (Title II), discrimination by a public entity for refusal to make reasonable accommodation to an otherwise qualified individual with a disability.

## JURISDICTION AND VENUE

2. Jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1343 and the aforestated statutory provisions.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as all of the events giving rise to this cause of action occurred in the District of Colorado.

## STANDING

4. Plaintiff has standing under the U.S. Constitution, Art. III, to bring this action because as a result of Defendants' refusal to make reasonable accommodation, in violation of the ADA, he has suffered, continues to suffer, and will in the future suffer deprivation of meaningful access to the University of Colorado Health Sciences Center (School of Medicine or SOM) to complete his medical education.

## PARTIES

5. Plaintiff Taylor Christian Profita is now and was at all times pertinent hereto a resident of the State of Colorado, and an "otherwise qualified" individual with a disability protected by the ADA.

6. Defendant The Regents of the University of Colorado (Regents), whose principal office is in Denver, Colorado, is now and was at all times pertinent hereto a body corporate designated under Colorado law to govern, control and supervise the School of Medicine, and is a "public entity" as that term is used in the ADA.

7. Defendant School of Medicine, with its main campus in Aurora, Colorado, is now and was at all times pertinent hereto a state institution of higher education operating under the control, governance, and supervision of the Regents, and at all times pertinent

hereto was acting by and through its agent the Dean of the School of Medicine, and is a "public entity" as that term is used in the ADA.

8. Defendant John J. Reilly, Jr., M.D., is now and was at all times pertinent hereto a Colorado resident, and the Dean, principal administrative officer, and agent for and on behalf of the School of Medicine, empowered, inter alia, to act as final authority and decision-maker as to matters involving dismissal of medical students, is sued herein in his official capacity as Dean of the School of Medicine under the doctrine of *Ex parte Young*, and is a "public entity" as that term is used in the ADA.

## FACTUAL ALLEGATIONS

9. At all times pertinent hereto, Plaintiff had and currently has the physical and mental impairments of Major Depressive Disorder, moderate to severe (DSM-5 296.26) (MDD) and Unspecified Anxiety Disorder, mild to severe (DSM-5 300.00), with complications of chronic insomnia/sleep apnea and hypothyroidism.

10. These disorders are documented in the September 9, 2016, Evaluation of Plaintiff by Kathleen Matthews, M.D., Diplomat, American Board of Psychiatry and Neurology, Certification in the Subspecialty of Forensic Psychiatry, which report contains the June 3, 2016, Evaluation of Shauna Casement, Psy. D., Licensed Clinical Psychologist.

11. Plaintiff has a long-standing history of these physical and mental impairments.

12. Plaintiff was admitted to the School of Medicine based upon extensive interviews, 3.8 undergraduate GPA, and a superior MCAT of 34, which score, upon information and belief, exceeds the norm for the School of Medicine.

13. Plaintiff commenced his studies at the SOM in the fall of 2008, and matriculated there during the academic years of 2008-2009, 2009-2010, 2010-2011, and 2011-2012.

14. Plaintiff's performance for the first three academic years, through the spring and summer of 2011, was successful with grades of "pass" and "high pass", passage of Step 1 of the NBME, and successful completion of the first five of seven third year block clinical rotations.

15. Reviews of Plaintiff's performance in these five rotations include: "Taylor did exceptionally well with this rotation," "skills were appropriate for someone at this stage," "Taylor was a pleasure to have on the rotation," "impressed our team with very precise and organized patient presentations," "for his level of training . . . possessed knowledge above expectations . . . a pleasure to have on service."

16. Notwithstanding his impairments described in ¶ 9, Plaintiff was able to adequately perform at the SOM for three years.

17. Then in the fall of 2011 came a tipping point, with additional outside pressures, worsening depression, anxiety, and sleep disturbance, which were not adequately treated or controlled by the treating physician, Lynn Fenton, M.D., psychiatrist at the SOM Student Health Service.

18. Due to scheduling, the last two of the third year seven clinical rotations, Hospitalized Adult Care (HAC) and Women's Care, were taken in this period, the fourth academic year of 2011-2012.

19. HAC commenced on August 15, 2011, continuing until November 9, 2011, and Women's Care commenced November 11, 2011, ending January 27, 2012.

20. Plaintiff failed these two rotations and was placed on academic probation, as well as leave of absence for the spring semester of 2012.

21. A May 21, 2012 letter from the SOM's Student Promotions Committee informed Plaintiff of the above, advising that he would be returned to good academic status if he successfully remediated the HAC and Women's Care blocks.

22. The May 21st letter also expressed "major concerns" about Plaintiff's "personal wellness."

23. A November 11, 2011 email between professors stated, "I really did have concerns about him."

24. The May 21st letter also stated "the Committee voted to require an evaluation from CPHP [Colorado Physicians Health Program]. They will review a final report from CPHP and based on this consider the next steps."

25. Plaintiff was then evaluated by CPHP's Scott Humphreys, M.D., psychiatrist, who in his July 20, 2012 report stated, "We have reviewed symptoms that would suggest a mood syndrome . . . disabling anxiety disorder . . . psychotic disorder."

26. Plaintiff denied symptoms of the above because of lack of recognition/understanding.

27. According to Dr. Matthews, Dr. Humphreys then made a critically inaccurate diagnosis of "maladaptive personality traits," not recognizing Plaintiff's MDD and anxiety disorders, despite Dr. Fenton's input and medical records documenting MDD with symptoms not in remission at that time as well as before and after the CPHP evaluation.

28. "Having a major depressive disorder and an anxiety disorder that is inadequately treated . . . can [as it did in this case in 2011-2012] radically negatively impact one's ability to learn and retain complicated medical information." Dr. Matthews' Evaluation.

29. Dr. Humphreys' "obviously incorrect diagnosis when compared to Mr. Profita's psychiatric treatment records and information that CPHP itself obtained. . . misled the University Promotions Committee and allowed that University Committee to avoid the issue of accommodating Mr. Profita's illness." Dr. Matthews' Evaluation.

30. Plaintiff was reinserted back into remediation of the Women's Care rotation which he promptly failed due to his uncontrolled MDD and anxiety disorder, compounded by his unmanaged sleep disorder and hypothyroidism.

31. Since Plaintiff needed to pass both HAC and Women's Care remediations, he never got to the HAC remediation.

32. "According to Dr. Fenton's notes, Mr. Profita's symptoms of major depressive disorder worsened [further] after the evaluation of Dr. Humphreys and during his repeated OB/Gyn rotation in the fall of 2012." Dr. Matthews' Evaluation.

33. Upon recommendation of the Promotions Committee, on January 3, 2013, Richard D Krugman, M.D., then Dean of School of Medicine, sent Plaintiff a letter of dismissal "for unsatisfactory academic performance."

34. Pursuant to Section 3.2.5 "Dismissal" in the University of Colorado School of Medicine Policies and Procedures M.D. Program (Policies), for the academic year of 2012-2013, "The final decision for dismissal resides with the Dean of the School of Medicine."

35. The same provision exists under the Policies for the current academic year of 2016-2017.

36. Neither of the above two Policies has a procedure for readmission after dismissal, as does, *e.g.*, NYU Medical School, reference *Doe v. New York University*, 666 F. 2d 761 (2nd Cir. 1981).

37. Both versions of the Policies contain an introductory caveat that "the provisions of this document are designed by the University to serve as guidelines rather than absolute rules, and exceptions may be made on the basis of particular circumstances."

38. Since his dismissal, Plaintiff has worked on his psychological issues with professional help.

39. On September 26, 2016, Plaintiff had hand-delivered duplicate originals of a letter to Defendants "requesting the reasonable accommodation . . . of readmitting me to the M.D. program at the point where these issues first began to have significant impact upon my performance . . . being granted credit for those courses and clerkships that I have completed successfully, with reinsertion into the program at the point of entering the Internal Medicine and Women's Care clinical clerkships."

40. Plaintiff stated in his letter that having to apply to start over in medical school, as he had previously been advised, would not be a reasonable accommodation.

41. One of the reasons Plaintiff gave was that (*if* accepted after dismissal) starting over would necessitate incurring an additional $300,000 in student debt, the amount for repeat of three years of successfully completed medical schooling.

42. Plaintiff's September 26th letter explained that the extent and impact of his medical/psychological issues, under which he was laboring in the 2011-2012 academic year, has only been learned since his dismissal.

43. Plaintiff attached Dr. Matthews' Evaluation to his September 26th letter, which report (along with Dr. Casement's Evaluation) was specifically referenced and incorporated in the letter.

44. In the September 26th letter, Plaintiff further explained that his medical/psychological issues were now under control, well managed, and treated through therapy and correct medication.

45. Dr. Matthews' and Dr. Casement's reports substantiated this with detailed and thorough medical/psychological evaluations.

46. "With more active and aggressive medication management and supportive psychotherapy it is likely that Mr. Profita would have been and would be successful in medical school." Dr. Matthews' Evaluation.

47. "Mr. Profita's major depressive disorder is currently in remission . . . . His prognosis is excellent with continued medications and supportive psychotherapy." Dr. Matthews' Evaluation.

48. "[T]here is no significant or appreciable risk of recurrence of symptoms which would interfere with completion of Mr. Profita's medical studies . . . [, his conditions] now in remission and well managed." Dr. Casement's Evaluation.

49. "Mr. Profita's current IQ [133] and memory are clearly within the range necessary for doing well in medical school . . . ." Dr. Matthews' Evaluation.

50. “Mr. Profita’s diagnoses are common diagnoses and there is nothing inherent in either that would preclude his successful completion of medical school [when properly managed].” Dr. Matthews’ Evaluation.

51. Dr. Matthews further stated in her Evaluation: “Based on my personal knowledge and experience, having been a member of the Colorado Board of Medicine for eight years, there are physicians in the state of Colorado who have major depressive disorder and anxiety disorders and who successfully practice medicine. Major depressive disorder and anxiety disorders are treatable illnesses that are common and that clearly can be accommodated by a medical school during training and after training in a physician’s practice.”

52. On October 14, 2016, Defendants responded to Plaintiff’s September 26th letter via letter from the current Dean of the School of Medicine, John J. Reilly Jr., M.D., denying Plaintiff’s requested accommodation of readmission.

53. The October 14th letter stated, “The Americans with Disability Amendments Act (ADAAA) [Law on January 1, 2009], which requires the School of Medicine to accommodate students with disabilities, does not apply retroactively. As such, the School of Medicine does not have a retroactive obligation under the ADAAA to readmit you to the School of Medicine as an accommodation.”

54. The October 14th letter further stated that “School of Medicine policy requires students who are dismissed from [sic] the School of Medicine to reapply as a new student through the Medical School Admissions Committee . . . .”

## **CLAIM FOR RELIEF — VIOLATION OF THE ADA**

55. Paragraphs 1-54 are incorporated by reference at this place herein.

56. Title II of the ADA, 42 U.S.C. § 12132 "Discrimination," provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

57. Defendants are public entities. ADA § 12131(1)(B); *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2nd Cir. 2003), cert. denied, 541 U.S. 936 (2004) (official capacity as "public entity").

58. The introductory definition of "disability" in ADA § 12102 applies to Title II of the ADA.

59. Titles I and III of the ADA, and their Code of Federal Regulations (CFR) provisions, are applicable to Title II. H.R. Rep. No. 485 (III).

60. ADA § 12102(1) defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."

61. ADA § 12102(2) defines "major life activities as including sleeping, . . .learning, reading, concentrating, thinking, communicating . . . [and] brain functions."

62. ADA § 12102(4)(A) "Disability . . . Rules of Construction" provides that "the definition of disability . . . shall be construed in favor of broad coverage . . . ."

63. ADA § 12102(4)(D) provides that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," and subsection (E)(i)(I) provides that "[t]he determination of whether an impairment

substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—medication . . . .”

64. The ADA Title I implementing regulation 29 CFR § 1630.2(j)(3)(iii) states that “it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . major depressive disorder . . . substantially limit[s] brain function.”

65. Inadequately treated MDD that is not in remission substantially limits one’s ability to learn. Dr. Matthews’ Evaluation.

66. Plaintiff’s impairments, any one or in combination, substantially limit(s) him in one or more major life activities when in an unmitigated state, including brain function, learning, concentrating, thinking, communicating, and sleeping, thereby constituting a disability or disabilities entitling him to protection under the ADA.

67. Plaintiff is a “qualified individual with a disability” under ADA § 12131(2) because “with reasonable modifications to . . . policies, [not requiring him to re-apply to the SOM as a new student, he] meets the essential eligibility requirements for . . . [continued] participation in [the] programs . . . provided by . . . [the SOM] public entity.”

68. Plaintiff has met or exceeded the standards for his acceptance to the SOM.

69. Plaintiff has demonstrated satisfactory progress toward completing his medical degree by accomplishing three academic years of medical school satisfactorily, with passage of Step 1 of the NBME.

70. Because the source of Plaintiff’s fourth year academic difficulties has been abated, making future work of satisfactory quality likely (reference ¶¶ 46-51), he is

"otherwise qualified" to resume his studies at the SOM with the reasonable accommodation of readmittance.

71. ADA § 12112 "Discrimination," subsection (b)(5)(A), states that "the term 'discriminate against a qualified individual on the basis of disability' includes—not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ."

72. ADA § 12182 (b)(2)(A)(ii) similarly defines "discrimination" as "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford . . . services . . . to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such . . . services . . . ."

73. The requested accommodation is necessary for Plaintiff to complete medical school.

74. There would be no undue hardship on the operation of the SOM or fundamental alteration of the nature of the services offered by the SOM if the requested accommodation is made.

75. This is a particular case not affecting a broad spectrum of student body, to be determined upon its own facts and circumstances, as is the legal requirement in deciding Title II cases.

76. Readmission back into medical school after dismissal can constitute one type of "reasonable accommodation" under Title II of the ADA. *Riedel v. Board of Regents*,

1993 U.S. Dist. LEXIS 17262 (District of Kansas); *Doe v. New York University*, 666 F. 2d 761 (1981).

77. Both Dr. Matthews' and Dr. Casement's Evaluations recommended/discussed "completion" of medical school, never suggesting that Plaintiff start medical school over again, nor anticipating any problems in reinserting Mr. Profita.

78. "[S]ituations [as in Mr. Profita's case] may arise where a refusal to modify an existing program . . . become[s] unreasonable and discriminatory." *Southeastern Community College v. Davis*, 442 U.S. 397, 413 (1979).

79. Title II "by reason of disability" is to be interpreted broadly so as not to prevent access to public services. *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2nd Cir. 2003), cert. denied, 541 U.S. 936 (2004).

80. Plaintiff does not have to establish intent in proving Title II discrimination. The ADA simply requires that Plaintiff establish that Defendants failed to make a reasonable accommodation for an otherwise qualified individual with a disability. ADA §§ 12112(b)(5)(A) and 12182 (b)(2)(A)(ii); *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 848 (7th Cir. 1999).

81. Plaintiff need only show that his requested accommodation "seems reasonable on its face." *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260 (10th Cir. 2015).

82. Plaintiff's proposed accommodation is "reasonable on its face" if it would "enable him to perform the essential function"—in this case, completing his medical school education. *Osborne v. Baxter Health Corp.*, 798 F.3d 1260 (10th Cir. 2015).

83. Plaintiff "must be provided with meaningful access to the benefit . . . ." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

84. Permission to apply to the SOM as a new student, and start medical school over again *if* Plaintiff would even be admitted given his dismissal status, incurring an additional $300,000 in student debt, is not "meaningful access to the benefit" of reinsertion into the SOM to complete medical school and is not a reasonable accommodation.

85. Defendants must make such modifications "as are necessary to ensure that . . . [their refusal to readmit Plaintiff does not] have the effect of discriminating . . . against a qualified handicapped applicant or student," as it does in this case. 45 CFR § 84.44 (a).

86. The request for readmittance is causationally tied to Plaintiff's disabilities—*but for* his disabilities and their worsened and unmanaged effect in the 2011-2012 school year he would not have been dismissed from the SOM and his request for readmission would not be necessary.

87. Plaintiff's disabilities are a substantial cause of his inability to obtain readmission.

88. Plaintiff's inability to obtain readmission is not so remotely or insignificantly related to his disabilities as not to be "by reason of" them.

89. The desired accommodation of readmission to the SOM will affirmatively enhance Plaintiff's quality of life, pursuit of his lifetime ambition and passion to become a physician, by ameliorating the effects of his disability.

90. Despite the provisions of ADA law as set forth herein, and knowledge of Plaintiff's disabilities and their effects, and Plaintiff's circumstances as a result of his

disabilities, Defendants, by and through the Dean of the SOM acting within the scope of his authority and duties, have refused the requested reasonable accommodation for Plaintiff's disabilities, and, by reason of these disabilities, have denied him meaningful access to the SOM to complete his medical studies in violation of Title II of the ADA.

91. Defendants' refusal, by and through the Dean of the SOM acting within the scope of his authority and duties, to make the requested reasonable accommodation has, in and of itself, violated Title II of the ADA per ADA §§ 12112(b)(5)(A) and 12182(b)(2)(A)(ii), reference *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 848-49 (7th Cir. 1999).

92. As a direct and proximate result of Defendant's violation of Title II of the ADA, Plaintiff is harmed and will continue to be harmed by deprivation of meaningful access (reference ¶¶ 83, 84) to the SOM to complete his medical education.

WHEREFORE, Plaintiff prays for declaratory judgment and relief against Defendants in the form of an order enjoining Defendants to allow Plaintiff's requested reasonable accommodation of readmittance to continue his medical education, plus award of reasonable attorney's fees, litigation costs, and for such other relief as this Court deems just.

Dated this 12th day of December, 2016.

Respectfully submitted,

/s/ John B. Roesler

JOHN B. ROESLER
899 Logan Street, Suite 200
Denver, Colorado 80203
Tel: (303) 832-1282
Email: jroesler@lawyer.com

ATTORNEY FOR PLAINTIFF